BUCHALTER
A Professional Corporation
KEVIN T. COLLINS (SBN: 185427)
ALISSA R. PLEAU-FULLER (SBN: 258907)
500 Capitol Mall, Suite 1900
Sacramento, CA 95814
Telephone: 916.945.5170
Email: kcollins@buchalter.com
apleaufuller@buchalter.com

Attorneys for Plaintiff
Alterna Capital Solutions LLC, a
Florida limited liability company

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| ALTERNA CAPITAL SOLUTIONS LLC, a Florida limited liability company, | Case No. _____ |
| Plaintiff, | **COMPLAINT FOR BREACH OF GUARANTY** |
| vs. | |
| LOUIS ARRIOLA, an individual, | |
| Defendant. | |

BUCHALTER
A PROFESSIONAL CORPORATION
SACRAMENTO

COMPLAINT FOR BREACH OF
GUARANTY

Case No. _____

## COMPLAINT

Plaintiff, Alterna Capital Solutions LLC, a Florida limited liability company ("Alterna") alleges as follows:

### I.  INTRODUCTION

1.  Over the last almost two years, Alterna and LDI Networks Inc., a Florida corporation ("LDI") and telecommunications wholesale organization that buys and sells Voice over Internet Protocol ("VoIP") traffic, have maintained a relationship wherein Alterna purchased participations in LDI's accounts, including LDI assigning payments on its accounts receivables to Alterna.  LDI and Alterna enjoyed a profitable business relationship until recently when LDI's customers began to slow down their repayment (or completely stop all payments) to Alterna.

2.  Alterna secured LDI's obligations through various Invoice Purchase and Security Agreements, as well as a personal guaranty from individual Defendant Louis Arriola.

3.  In this action, Alterna seeks repayment of $6,469,958.09 in monies loaned to LDI, plus accrued interest, which remains past due and owing.

### II.  PARTIES

4.  Alterna is a limited liability company organized under the laws of the state of Florida and registered to do business in California as a foreign entity.  At all times relevant to this action, Alterna maintained an active license as a commercial finance lender.  Alterna provides commercial financing to lenders and factors by entering into participation agreements whereby Alterna purchases a participation interest in certain loans or by making direct loans or cash advances to them. Alterna's members are four individuals, each of whom are domiciled in Florida.

5.  Louis Arriola ("Arriola"), an individual, is LDI's Chief Operating Officer.  Arriola resides in, is a citizen of, and is domiciled in the State of California and executed a personal guaranty, guaranteeing all of LDI's obligations to Alterna.

BUCHALTER
A PROFESSIONAL CORPORATION
SACRAMENTO

2

**COMPLAINT FOR BREACH OF
GUARANTY**

Case No. _____

## III.   JURISDICTION

### A.   Subject Matter Jurisdiction

6.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(a)(1) because there is complete diversity of citizenship among the parties to this action and the amount in controversy exceeds $75,000, exclusive of interest and costs. Alterna is a Florida limited liability company and its four members are all individuals domiciled in Florida.  Defendant Arriola is an individual domiciled in California.

### B.   Personal Jurisdiction

7.     This Court has personal jurisdiction over Arriola because he is an individual domiciled in California.

## IV.   VENUE

8.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Arriola, the only Defendant, is an individual who resides in Los Angeles County, California, which is located within this district and the Western Division.

## V.   FACTUAL BACKGROUND

9.     LDI trading partners purchase the use of LDI's network to develop VoIP services via proprietary switches that run VoIP minutes to telecommunication providers that have sold access to LDI.  LDI and its customers use escrow banking accounts to streamline their cash flow.  LDI used the company Telefinance (Deal Defenders LLC) ("Telefinance") as an escrow partner when Alterna first began its factoring relationship with LDI.

10.     All money into and out of LDI and its trading partners ran through Telefinance to avoid delays with large wires.  In 2019, LDI also utilized a company called Telescrow, Inc.

11.     Alterna receives and sends all payments into Telefinance, and Alterna receives payments from LDI customers from both escrow partners.

Buchalter
A Professional Corporation
Sacramento

**COMPLAINT FOR BREACH OF GUARANTY**

Case No. _____

12.     Alterna is able to measure traffic for purchased invoices through its switch placed on the LDI network and measures the call minutes that LDI customers run via the LDI network.  Alterna also receives copies of all invoices from LDI for minutes and rates per minute for each insured customer.

13.     The LDI customers sign "no offset" letters for Alterna confirming the price volume for each invoice.  Alterna purchases invoices and confirms use using the Alterna switch and advances 85% of the invoice value.

14.     Each trading partner's receivables are also insured by LDI via its insurer.  Alterna is the Loss Payee for all insurance claims granted for invoices that Alterna has purchased.

**VI.     Agreements**

**A.      Invoice Purchase and Security Agreement**

15.     On or around January 11, 2019, Alterna and LDI entered an Invoice Purchase and Security Agreement ("Agreement").  A true and correct copy of the Agreement is attached and incorporated into this Complaint as **Exhibit "A"** (certain commercially sensitive and personal information has been redacted from certain Exhibits incorporated into this Complaint).

16.     Under the Agreement, including, without limitation:

a.      Alterna will advance to LDI $7,000,000, which can be increased to $25,000,000 upon amendment (the "Advance"), and Alterna has advanced at least $6,469,958.09 ("Obligations") under the Agreement.

b.      LDI has agreed to pay to Alterna an adjustable interest rate on the Advance (as calculated under the terms of the Agreement), and on any other payments from Alterna to LDI pursuant to the Agreement;

c.      LDI agreed to pay certain fees and expenses to Alterna;

d.      LDI's Obligations to Alterna are secured by a lien on all "Collateral" defined as "[a]ll now owned and hereafter acquired personal property

BUCHALTER
A PROFESSIONAL CORPORATION
SACRAMENTO

**COMPLAINT FOR BREACH OF GUARANTY**

Case No. _____

and fixtures, and proceeds thereof, (including proceeds of proceeds) of Seller including without limitation: Accounts, including accounts receivables; chattel paper; inventory; equipment; instruments, including promissory notes; investment property; documents; deposit accounts; letter of credit rights; general intangibles and supporting obligations" ("Collateral") under Section 1.8;

e.      Under section 8, the Obligations are due upon Alterna's demand;

f.      Under section 19.2, after an Event of Default, Alterna can immediately terminate the Agreement by written notice to LDI "at which time all obligations shall immediately become due and payable without further notice", and Alterna may also exercise all of its rights and remedies, such as filing a suit to recover the amounts against LDI;

g.      Under section 25, LDI agreed to pay all reasonable attorneys' fees and costs incurred by Alterna as a result of Alterna having to enforce the Agreement and LDI's failure to comply with the Agreement;

h.      The following events are each defined as an "Event of Default" under the Agreement:

> "(a) receipt of payment by Seller or a third party of a Purchased Account which is not paid to Purchaser within three (3) business days following the date of Seller's receipt or knowledge of receipt by such third party; (b) Seller defaults in the payment of any obligations to Purchaser when due hereunder that is not paid within five (5) business days after demand; (c) Seller fails to perform any covenant or agreement, provision or other undertaking under this Agreement that is not cured within five (5) business days after notice to Seller; (d) any representation or warranty of the Seller contained in this Agreement proves to be false in any material respect; (e) Seller or any guarantor of the obligations becomes subject to any debtor-relief proceedings; (f) any guarantor fails to perform or observe any of the guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty, or any guaranty shall cease to be in full force and effect for any reason whatever; or (g) other than with respect to Purchaser or VOIP Capital (as permitted under the Intercreditor Agreement) any lien,

5

**COMPLAINT FOR BREACH OF GUARANTY**

Case No. _____

garnishment, attachment or the like shall be issued against or shall attach to the Purchased Accounts, the Collateral or any portion thereof and the same is not released within five (5) days; (h) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment of performance…." (Sect. 19.)

i.      Notwithstanding whether there is an Event of Default, Alterna can terminate the Agreement upon 30 days' notice and can stop purchasing accounts at any time.  (Sect. 21.2.)

j.      Notwithstanding whether there is an Event of Default, Alterna can take the actions identified in Section 11.

k.      Alterna can pursue collection of the Collateral by making demand or filing suit against the Account Debtors; and

l.      Under Section 1.5, Alterna and LDI agreed that Florida law governed the Agreement and its enforcement.

17.     The Obligations remain due and owing to Alterna.

**B.      Arriola Guaranty**

18.     On or about January 11, 2019, and in connection with the Agreement, Arriola executed an Individual Guaranty for Alterna's benefit ("Guaranty").  A true and correct copy of the Guaranty is attached and incorporated into this Complaint as **Exhibit B**.

19.     Under the Guaranty, including without limitation, Arriola:

a.      Guaranteed all present and future obligations of LDI to Alterna, and prompt payment and performance of LDI's Obligations;

b.      Waived all suretyship defenses;

c.      Agreed that the Guaranty is a continuing guaranty;

d.      Waived any right to revoke the Guaranty (Sect. 12);

e.      Agreed to pay all reasonable attorneys' fees and costs incurred by Alterna as a result of Alterna having to enforce the Guaranty (Sect. 9);

f.      Agreed that Florida law governed the Guaranty and its

6

1 enforcement;

2         g.     There are no conditions precedent to Alterna's ability to enforce

3 the Guaranty.

4         h.     Alterna can make demand upon Arriola for the amount owed at

5 any time.

6         i.     If Arriola does not pay or respond in a manner that is acceptable

7 to Alterna, Alterna can file a lawsuit to pursue collection.

8     **C.**    **Discovery of Repayment Issues**

9     20.    Alterna requires LDI customers to make certain payments for 100% of

10 the face value of all purchased receivables within agreed credit terms.

11     21.    Within the last eight months, Alterna discovered that the flow of

12 payments had slowed, and in some cases completely stopped, for all LDI

13 customers.

14     22.    Alterna has determined that certain Purchased Accounts are

15 uncollectible or are otherwise no longer an Eligible Account pursuant to section 8

16 of the Agreement.

17     23.    Alterna demanded LDI and Arriola repay the Obligations, which they

18 have failed to do.

19     24.    Within the past month, with LDI's customers failing to make required

20 payments to Alterna, and LDI now refusing to repay the Obligations, there is now

21 over $6,469,958.09 in loaned monies due from LDI to Alterna, plus accruing

22 interest.

23     25.    LDI is currently in default under the Agreement based on its failure to

24 repay the past due obligations and multiple Events of Default.

25     26.    Arriola is also currently in default under the Agreement based on his

26 failure to repay the past due obligations.

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
SACRAMENTO

7

**COMPLAINT FOR BREACH OF GUARANTY**

Case No. _____

## FIRST CLAIM

### Breach of Written Guaranty

### (Against Defendant Arriola)

27.     Alterna incorporates by reference paragraphs 1 through 26 of this Complaint as though fully set forth in this claim.

28.     Under the Guaranty, Arriola personally guaranteed all of LDI's present and future Obligations to Alterna.

29.     Arriola waived any right to revoke the Guaranty and the Guaranty has not been terminated.

30.     Arriola breached the Guaranty by failing to promptly pay LDI's Obligations owed to Alterna.

31.     Alterna has performed all conditions, covenants and promises required of it under the Guaranty except those which may be excused as a matter of law.

32.     As a direct and proximate result of Arriola's breach of the Guaranty, Alterna has been damaged in the amount of at least $6,469,958.09 in monies, plus past due interest payments, and default interest, to be determined according to proof.

33.     Alterna also seeks attorney's fees, and costs, and prejudgment remedies, including a right to attach order and any other injunctive relief as deemed appropriate.

## PRAYER FOR RELIEF AGAINST ARRIOLA

WHEREFORE, Alterna prays for judgment against Arriola in this action as follows:

1.     For compensatory damages in the sum of $6,469,958.09 in monies or an amount according to proof, together with interest thereon;

2.     For prejudgment interest which continues to accrue;

3.     For prejudgment remedies, including a right to attach order and any

**BUCHALTER**
A PROFESSIONAL CORPORATION
SACRAMENTO

**COMPLAINT FOR BREACH OF GUARANTY**

Case No. _____

other injunctive relief as deemed appropriate;

4.     For all costs of suit incurred herein;

5.     For reasonable attorney's fees as may be provided by law;

6.     For interest as may be provided by law; and

7.     For such other and further relief, as the Court deems to be just and appropriate.

DATED:  August 12, 2020                         BUCHALTER
                                                A Professional Corporation


                                                By:  /s/ Kevin T. Collins
                                                KEVIN T. COLLINS
                                                ALISSA R. PLEAU-FULLER
                                                Attorneys for Plaintiff
                                                Alterna Capital Solutions LLC, a Florida
                                                limited liability company

BUCHALTER
A PROFESSIONAL CORPORATION
SACRAMENTO

**COMPLAINT FOR BREACH OF GUARANTY**

Case No. _____

**Exhibit A**

**INVOICE PURCHASE AND SECURITY AGREEMENT**

Jan 11 2019

THIS INVOICE PURCHASE AND SECURITY AGREEMENT ("Agreement") is made on _____ between LDI NETWORKS INC., a Florida Corporation, ("Seller") and Alterna Capital Solutions, LLC ("Purchaser").

1.        **Definitions and Index to Definitions**. The following terms shall have the following meanings. All capitalized terms not otherwise defined in this Agreement shall have the meaning set forth in the Uniform Commercial Code (the "UCC") as adopted in the Chosen State:

1.1.    "Advance Rate" – 85% (based on a trailing 12 month dilution, which should not exceed 5%), which percent may be revised at any time by Purchaser in Purchaser's sole and reasonable discretion.

1.2.    Intentionally Omitted.

1.3.    "Avoidance Claim" - Any claim that a payment received by Purchaser is a preference or otherwise avoidable under the United States Bankruptcy Code or any other debtor-relief statute.

1.4.    "Balance Subject to Funds Usage Daily Fee or Daily Fee" - The unpaid amount due on a Purchased Account minus the Reserve Account.

1.5.    "Chosen State" - Florida.

1.6.    "Clearance Days" – Three (3) business day.

1.7.    "Closed Account" - An Account for which Purchaser has received full payment.

1.8.    "Collateral" - All now owned and hereafter acquired personal property and fixtures, and proceeds thereof, (including proceeds of proceeds) of Seller including without limitation: Accounts, including accounts receivables; chattel paper; inventory; equipment; instruments, including promissory notes; investment property; documents; deposit accounts; letter of credit rights; general intangibles and supporting obligations.

1.9.    "Daily Fee" –the fee Seller shall pay to Purchaser, which shall be 0.05% multiplied by the unpaid amount of a Purchased Account, for each day that a Purchased Account has not been paid in full by an Account Debtor to Purchaser.  The Daily Fee shall increase or decrease on the same date as any change in the Prime Rate, by the Prime Rate Adjustment.

1.10 "Early Termination Fee" - See Sections 21.1. through 21.3.

1.11.   "Eligible Account" - An Account that meets the conditions under this Agreement for purchase by Purchaser, including Euler Insurance and signed "no-offset letter", as determined by Purchaser in its sole, discretion.

1.12.   "Euler Insurance" Seller will maintain a $10,000,0000 Euler Insurance policy with Purchaser as beneficiary.

1

1.13.  "Events of Default" - See Section 19.

1.14.   "Facility Fee" Seller shall pay Purchaser 1.0% of the "Maximum Amount" which is fully earned at closing; however, the Facility Fee shall be payable over 12 equal installments with the first payment due at closing date and each following payment charged at the first of each month.

1.15.   Intentionally Omitted.

1.16.   "Ineligible Account" - An Account other than an Eligible Account as deemed by Purchaser in its sole discretion.

1.17.   "Invoice" - The document that evidences or is intended to evidence an Account. Where the context so requires, reference to an Invoice shall be deemed to refer to the Account to which it relates.

1.18.   "Invoice Purchase Fee" – 0% multiplied by the amount due on a Purchased Account, which shall be charged and paid at the time of purchase of an Account.

1.19.   "Intercreditor Agreement" – That certain Intercreditor Agreement between Purchaser and VOIP Capital, to be executed between such parties prior the date hereof.

1.20.   "Late Charge" – 0% per annum, which shall accrue and be payable on demand on any obligation not paid when due.

1.21.   "Maximum Amount" – $7,000,000.  At Purchaser's sole discretion, the Maximum Amount may be increased to an amount of up to $20,000,000.  Any increase in the Maximum Amount above the initial $7,000,000 shall be subject to approval by Purchaser and subject to an additional Facility Fee.

1.22.   "Minimum Loan Fee"- If Seller does not maintain in any given month a minimum average loan balance $2,000,000, Purchaser will charge minimum fees based on an average loan balance of $2,000,000

1.23.   "Misdirected Payment Fee" – 10% of the amount of any payment on account of a Purchased Account which has been received by Seller or by a third party and not paid to Purchaser on the next Business Day following the date of receipt by Seller or the date of Seller's knowledge of receipt by such third party

1.24.    "Parties" - Seller and Purchaser.

1.25.   "Payor" - An Account Debtor, other obligor, or entity obligated on an Account, making payment for the account of such party.

1.26.   "Prime Rate" - The prime rate published by The Wall Street Journal, from time to time as its prime rate.

1.27.   "Prime Rate Adjustment" – 0.0007% Daily Fee change for every 0.25% change in the Prime Rate compared to  then-existing Prime Rate.

1.28.   "Purchase Price" - The unpaid amount due on a Purchased Account at the time of purchase

minus the Invoice Purchase Fee.

1.29.   "Purchased Account" - An Account purchased by Purchaser which is not a Closed Account.

1.30.   "Required Reserve Amount" – 100% of the Eligible Purchased Accounts minus the Advance Rate.

1.31.   "Reserve Account" - A bookkeeping account on the books of the Purchaser representing the portion of the Purchase Price which has not been paid by Purchaser to Seller, maintained by Purchaser to secure Seller's performance with the provisions hereof, and including, without limitation, the Required Reserve Amount.

1.32.   "Reserve Shortfall" - The amount, if any, by which the Required Reserve Amount exceeds the Reserve Account.

1.33.   "Term and Termination Date" - See Section 21.

2.        **Assignment and Sale**. Seller hereby sells and shall continue to sell to Purchaser as absolute owner, and Purchaser hereby purchases and shall continue to purchase from Seller, Seller's Accounts as Purchaser determines in its sole, discretion. Purchaser shall pay the Purchase Price of any Purchased Account, less the Required Reserve Amount and any amounts due to Purchaser from Seller, within two (2) business days of the date of such Purchase. Seller represents that all information provided by Seller to Purchaser with respect to any Purchased Accounts are true and correct, the Purchased Accounts are collectible, and are being sold to Purchaser free and   clear of any claims

3.        **Reserve Account**. Purchaser may credit any portion of any Purchase Price to the Reserve Account up to the amount of the Reserve Shortfall. So long as there is no existing Event of Default, Purchaser shall pay to Seller upon Seller's request, any amount by which the Reserve Account exceeds the Required Reserve Amount. Purchaser may charge the Reserve Account for any amounts accrued and unpaid from Seller to Purchaser.

4.        **Notice of Assignment and Lock Box**. Purchaser is hereby authorized to send a written notice in substantially the form attached as <u>Appendix A</u> hereto, to notify any Account Debtor obligated with respect to any Account that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser. All Invoices for Accounts sent by Seller to Account Debtors shall contain on the face of the Invoice the following legend: "This account is assigned and payable only to Alterna Capital Solutions, LLC ("ACS"). All Payments shall   be sent to ACS at: P.O. Box 936601, Atlanta, GA 30354-1705."

5.        **Authorization for Purchases**. Purchaser is authorized to purchase Accounts upon instructions   received from any authorized representative designated by Seller.

6. **Fees**. Seller shall pay to Purchaser throughout the Term and any Renewal Term of this Agreement the Invoice Purchase Fee, the Daily Fee, the Aging and Collection Fee, and the Late Charge on the date(s) that each Fee is due and payable as provided as set forth in Sections 1.9., 1.18., and 1.19. herein.

7.        **Other Charges and Expenses**. Seller shall reimburse Purchaser for all of the following costs if the Purchaser incurs such costs in connection with this Agreement: $15.00 for wire fees, the actual UCC Filing fees, the Misdirected Payment Fee, and the actual, reasonable field examination

fees directly incurred by Purchaser in the administration of this Agreement (collectively, "Reimbursable Expenses."). Reimbursable Expenses are due at the time of payment of the applicable fees or expenses by Purchaser and may be charged to the Reserve Account.

8.      **Repurchase Of Accounts**. Seller shall promptly and in any event within five (5) business days of demand by Purchaser, repurchase any Purchased Account that Purchaser determines at any time is uncollectible for any reason or is otherwise no longer an Eligible Account and on such demand shall pay to Purchaser the then unpaid amount due on the Purchased Account, together with any accrued but unpaid fees relating to the Purchased Account. Purchaser shall retain its security interest in any Purchased Account repurchased by Seller.

9.      **Security Interest**. To secure payment and performance of all present and future obligations of Seller to Purchaser, Seller grants to Purchaser a continuing first priority security interest in and to the Collateral  Seller shall execute and deliver to Purchaser such documents and instruments, including without limitation, UCC-1 financing statements, as Purchaser may request from time to time in order to evidence and perfect its security interest in the Collateral. Seller authorizes Purchaser to file a UCC-1 financing statement, including without limitation, original financing statements, amendments and continuation statements, in all jurisdictions and offices Purchaser deems appropriate which names Seller as the debtor and describes the Collateral. Notwithstanding the creation of this security interest, it is the intent of the parties that the relationship of the parties in respect to all Purchased Accounts shall at all times be that of purchaser and seller, and not that of lender and borrower; however, the grant of this security interest and actions taken with respect thereto to perfect such security interest are taken out of an abundance of caution in the event that the relationship is deemed to be that of lender and borrower.

10.     **Clearance Days**. Clearance Days shall be added to the date on which Purchaser receives any  payment before such payment is credited to reduce outstanding amounts due hereunder.

11.     **Authorization to Purchaser**. Seller will attempt to work with the Purchaser to develop a reasonable plan to implement, at Seller's sole expense, the powers identified in this paragraph 11. Notwithstanding the foregoing, Purchaser shall have sole discretion to exercise at any time any of the following powers until all of the Seller's obligations to Purchaser have been fully satisfied and discharged: (a) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, proceeds of any Collateral; (b) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of all Collateral; (c) file any claim under any bond or under any trust fund; (d) pay any sums necessary to discharge any lien, claim, or encumbrance which is senior to Purchaser's security interest in any assets of Seller, which sums shall be included as obligations of Seller and which shall accrue the Late Charge and be immediately due and payable; (e) notify any Payor obligated with respect to any Account, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order and directly and solely to Purchaser; (f) communicate directly with Seller's Payors to verify the amount and validity of any Account created by Seller; (g) endorse and deposit on behalf of Seller any checks tendered by an Account Debtor "in full payment" of its obligation to Seller; and (h) compromise or settle any claim of Seller against any Account Debtor for less than the face value of such obligation of the Account Debtor.

12.     **ACH Authorization**. In order to satisfy any of the Seller's obligations to Purchaser or to recover any overpayment made by Purchaser to Seller, Purchaser is authorized and may process electronic debit  or credit entries through the ACH system to any deposit account of Seller.

4

13. **Agreements By Seller**.

13.1.  After written notice by Purchaser to Seller, and automatically, without notice following an Event of Default, Seller shall not (a) grant any extension of time for payment of any of its Accounts, (b) compromise or settle any of its Accounts for less than the full amount, (c) release in whole or in part any Account Debtor, or (d) grant credits, discounts, allowances, deductions, or return authorizations for any Accounts.

13.2.  Seller must keep at its principal place of business for a period of five years all books of account and business records customary for the industry, which (subject to appropriate written confidentiality agreements between Seller and Purchaser after termination of this Agreement) books and records are subject to inspection by Purchaser and its agents and representatives during normal business hours. Purchaser or its designee shall have reasonable access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, and Seller shall permit Purchaser or its designee to make copies of such books and records as  Purchaser may request.

13.3.  Seller must give Purchaser 30 business days' prior written notice of any proposed change to its present name, the address of its headquarters or where its books and records are located, any proposed purchase of a majority interest in its equity ownership or proposed purchase of all or substantially all of its assets, any management, and any proposed change to its jurisdiction of organization or type of legal organization.

13.4.  Seller shall pay when due all of its payroll and other taxes and shall provide proof of payment to Purchaser.

13.5.  Other than VOIP Capital, Seller shall not create, incur, or permit the existence of any perfected security interest upon any Collateral without the  prior consent of Purchaser.

13.6.  Seller shall provide Purchaser, within 2 business days of receipt by Seller, copies of any business or legal notices, summonses, complaints, or other proceedings received by Seller.

13.7.  Seller shall pay to Purchaser on the next banking day following the date of receipt by Seller the amount of (a) any payment on account of a Purchased Account; and (b) after the occurrence of an Event of Default, any payment on account of any Account.

14.      **Account Statement**. Purchaser may make available to Seller a statement setting forth the transactions arising hereunder. Each statement shall be considered correct and binding upon Seller as an account statement, except to the extent that Purchaser receives, within 30 days after the availability of such statement, written notice from Seller of any specific exceptions by Seller to that statement, and then it  shall be binding against Seller as to any items to which it has not objected.

15.      **Account Disputes**. Seller shall notify Purchaser of all disputes concerning any Purchased Account, and at Purchaser's request Seller shall settle all disputes concerning any Purchased Account, at Seller's sole cost and expense. Seller shall not, without Purchaser's prior consent, compromise or adjust a Purchased Account or grant any additional discounts, allowances or credits on a Purchased Account Purchaser may attempt to settle, compromise, or litigate any dispute upon such

5

terms, as Purchaser  deems advisable.

16.      **Representation and Warranties**. Seller represents and warrants that as of the date hereof (a) Seller is fully authorized to enter into this Agreement; (b) this Agreement constitutes a legal and valid obligation that is binding upon Seller and that is enforceable against it; (c) Seller is solvent and in good standing in the state of its organization; (d) other than as disclosed in writing to Purchaser prior to the date hereof, there are no pending actions, suits, or other legal proceedings of any kind (whether civil or criminal) now pending (or, to its knowledge, threatened) against Seller, the adverse result of which would in any material respect affect its property or financial condition, or threaten its continued operations; (e) Seller has not conducted business under or used any other name, whether legal or fictitious; (f) the Purchased Accounts are and will remain bona fide existing obligations created by the sale and delivery of goods or services in the ordinary course of its business, and are unconditionally owed to Purchaser without defenses, disputes, offsets, counterclaims, or rights of return or cancellation; and (g) Seller has not received notice of actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of any applicable Account Debtor regarding Purchased
Accounts.

17.      **Indemnification**. Seller agrees to indemnify Purchaser and save it harmless against any suits, claims, liabilities, demands and expenses, including but not limited to, any loss arising out of the assertion of any Avoidance Claim, and shall pay to Purchaser on demand the amount thereof including attorneys' fees and expenses, resulting from or arising under this Agreement. With respect to an Avoidance Claim, Seller shall notify Purchaser within two (2) business days of Seller's becoming aware of the assertion of an Avoidance Claim. This provision shall survive termination of this Agreement.

18.      **Disclaimer of Liability**. Purchaser will not be liable to Seller for any lost profits, lost savings or other consequential, incidental, punitive, or special damages resulting from or arising out of or in  connection with this Agreement.

19. **Default and Events of Default**. The following events will constitute an Event of Default hereunder: (a) receipt of payment by Seller or a third party of a Purchased Account which is not paid to Purchaser within three (3) business days following the date of Seller's receipt or knowledge of receipt by such third party; (b) Seller defaults in the payment of any obligations to Purchaser when due hereunder that is not paid within five (5) business days after demand; (c) Seller fails to perform any covenant or agreement, provision or other undertaking under this Agreement that is not cured within five (5) business days after notice to Seller; (d) any representation or warranty of the Seller contained in this Agreement proves to be false in any material respect; (e) Seller or any guarantor of the obligations becomes subject to any debtor-relief proceedings; (f) any guarantor fails to perform or observe any of the guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty, or any guaranty shall cease to be in full force and effect for any reason whatever; or (g) other than with respect to Purchaser or VOIP Capital (as permitted under the Intercreditor Agreement) any lien, garnishment, attachment or the like shall be issued against or shall attach to the Purchased Accounts, the Collateral or any portion thereof and the same is not released within five (5) days. ; (h) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment of performance of any obligations.

19.1.  SELLER WAIVES ANY REQUIREMENT THAT PURCHASER INFORM SELLER BY AFFIMATIVE ACT OR OTHERWISE OF ANY ACCELERATION OF SELLER'S OBLIGATIONS. PURCHASER'S FAILURE TO

6

CHARGE OR ACCRUE INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY PURCHASER OF ITS CLAIM FOR SUCH INTEREST OR FEES.

19.2.   Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement by written notice to Seller, at which time all obligations shall immediately become due and payable without further notice.

20.      **Amendment and Waiver**. Only a writing signed by all parties may amend this Agreement. No failure or delay in exercising any right shall impair any right that Purchaser has, nor shall any waiver by Purchaser be deemed a waiver of any default or breach occurring subsequently. Purchaser's rights and remedies are cumulative and not exclusive of each other or of any rights or remedies that Purchaser  would otherwise have.

21.      **Term and Termination Date**. This Agreement shall be effective when executed by all of the Parties, shall continue in full force and effect for 36 months thereafter (the "Term"), and shall be further extended automatically annually (the "Renewal Term"), unless Seller provides written notice of its intention to terminate at least 60 days prior the end of the respective Term or Renewal Term. Notwithstanding the preceding sentence, such termination shall not occur and the Agreement shall continue as if no notice was given unless, prior to or on the termination date, Seller has fully repaid Purchaser all monies due, and delivered to Purchaser the release as required by Section 22. below.

21.1.   If Seller provides notice of its intent to terminate under Section 21. above, then in addition to any other fees or amounts due under this Agreement, Seller agrees that it will pay Purchaser an early termination fee equal to 3% of the Maximum Amount if this Agreement is terminated during the first 12 months of this Agreement, 2% of the Maximum Amount if this Agreement is terminated during months 12 through month 24, and 1% of the Maximum Amount if this Agreement is terminated thereafter, in each case multiplied by the number of months remaining in the Term or any Renewal Term (the "Early Termination Fee"). If Purchaser does not provide Seller with increase to Maximum Amount of $7,000,000 within 30 days of closing, this Early Termination Fee will be waived for a subsequent 90 days, which would end on 120th day of the post-closing day.

21.2.   Purchaser may terminate this Agreement at any time by giving Seller 30 days' prior written notice of termination, whereupon this Agreement shall terminate on the earlier date of 30 days thereafter or the end of the then current Term or Renewal Term, upon which termination date Seller shall fully repay to Purchaser all monies due and deliver to Purchaser the release as required under Section 22 below.

22.      **No Lien Termination without Release**.  Notwithstanding payment in full of all obligations by Seller, Purchaser shall not be required to record any termination or satisfaction of its liens on the Collateral unless and until Seller and any guarantors deliver to Purchase a general release.  Seller understands that this provision constitutes a waiver of its rights under §9-513 of the UCC.

23.      **Conflict**. Unless otherwise expressly stated in any other agreement between Purchaser and Seller, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement,   the provisions of this Agreement shall control.

24.      **Severability**. In the event any one or more of the provisions contained in this Agreement is

7

held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining  provisions contained herein shall not in any way be affected or impaired thereby.

25.        **Expenses**. In addition to those Expenses set forth in Section 7 herein, Seller agrees to reimburse Purchaser the actual amount of all costs and expenses, including reasonable attorneys' fees and expenses, which Purchaser may incur (a) protecting, preserving or enforcing any lien, security or other right granted by Seller to Purchaser or arising under applicable law, whether or not suit is brought, including but not limited to the defense of any Avoidance Claims or the defense of Purchaser's lien priority; (b) for travel and attorneys' fees and expenses incurred in complying with any subpoena or other legal process in any way relating to Seller; and (c) for the actual amount of all costs and expenses, including reasonable attorneys' fees, which Purchaser may incur in enforcing this Agreement, or in connection with any federal or state insolvency proceeding commenced by or against Seller or any Account Debtor, including those (i) arising out of an automatic stay, (ii) seeking dismissal or conversion of a bankruptcy proceeding or (iii) opposing confirmation of Seller's plan thereunder. All Expenses will be subtracted from the Reserve Account and are payable by Seller upon demand by Purchaser. This  provision shall survive termination of this Agreement.

26.        **Entire Agreement**. This Agreement supersedes all prior or contemporaneous agreements and understandings between the parties, verbal or written, express or implied, relating to the subject matter hereof. No promises of any kind have been made by Purchaser or any third party to induce Seller to execute this Agreement. No course of dealing, course of performance, or trade usage, and no parol evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

27.        **Choice of Law**. This Agreement shall be governed by, construed under, and enforced in accordance  with the internal laws of the Chosen State.

28.        **Jury Trial Waiver**. IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (a) ARISING HEREUNDER, OR (b) IN ANY WAY CONNECTED
WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

29.        **Venue**; **Jurisdiction**. The parties agree that any suit, action, or proceeding arising out of the subject matter or the interpretation, performance, or breach of this Agreement, shall, if Purchaser so elects, be instituted in the Courts of Orange County, Florida (each an "Acceptable Forum"). Each Party agrees that the Acceptable Forums are convenient to it, and each Party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered in connection with this Agreement, and waives any and all objections to jurisdiction or venue that it may

have under the laws of the Acceptable Forums or otherwise in those courts in any such suit, action, or proceeding. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Purchaser as a consequence of such proceeding having been commenced in a forum  other than an Acceptable Forum.

30.     **Counterparts**. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterpart of this Agreement, and any Party delivering such an executed counterpart of the signature page to this Agreement by such means to any other Party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other Party, provided that the failure to deliver such manually executed counterpart shall not affect   the validity, enforceability, or binding effect of this Agreement.

31.     **Notice**. All notices required to be given to any Party shall be deemed given upon the first to occur of (i) transmittal sent by commercial overnight carrier, (ii) transmittal by electronic means to a receiver under the control of such Party; or (iii) actual receipt by such Party or an employee or agent of such Party. Notices shall be sent to the following addresses, or to such other addresses as each such Party  may in writing hereafter indicate:

      PURCHASER:   Alterna Capital Solutions, LLC
                     222 W Comstock Avenue
                     Winter Park, FL 32789
                     President:  Eugene Stanley Carpenter
                     scarpenter@alternacs.com

      SELLER:     LDI NETWORK INC.
                     777 Arthur Godfrey Road. #300
                     Miami Beach, FL  33140
                     Attn:  Louis Arriola la@ldinetworks.com

32.     **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the  parties hereto and their respective successors and assigns.

33.     **Confidentiality and Nondisclosure**. The Parties agree that the terms of this Agreement, all business methods and trade secrets, and any and all other records and information clearly and specifically identified by the applicable Party as confidential will be held in strict confidence and treated as the confidential property of the other Party. A Party will not, except in the due performance of its duties or the enforcement of its rights under this Agreement, disclose any of the foregoing to any person, unless specifically authorized to do so in writing by the other Party or unless required by law. The  provisions of this Section shall survive the termination of this Agreement.

34.     **Headings**. The title of this Agreement and the subject headings of the sections and subsections of this Agreement are included for the purposes of convenience and shall not affect the construction of interpretation of any of its provisions.

35.     **Construction**. This Agreement and all agreements relating to the subject matter hereof are the product of negotiation and preparation by and among each party and its respective attorneys, and shall be construed accordingly.

9

IN WITNESS WHEREOF the parties hereto have affixed their hands and seals on the day and year first above written.

SELLER: LDI NETWORKS INC.

By: _Louis R. Arriola_____

Name: Louis Arriola_____

Title: Chief Operating Officer_____

PURCHASER: Alterna Capital Solutions, LLC

By: _Stan Carpenter_____

Name: Eugene Stanley Carpenter__

Title: President_____

**APPENDIX A**

**[To be placed on Company Letterhead]**

[CLIENT NAME
CLIENT ADDRESS]

[Date] 2019

Dear {CLIENT Name}

**Carrier Services Agreement dated on or about [      ] for the sale and purchase of wholesale telecommunication services ("Traffic") on each other's telecommunications systems ("Sales Contract")**

**NOTICE OF ASSIGNMENT**

LDI Network Inc.("**LDI**") has recently experienced growth in its business and due to this growth, we hereby give you notice that we have entered into an Invoice Purchase and Security Agreement, dated [_____] (the "**Account Purchase Agreement**") with Alterna Capital Solutions, LLC ("**ACS**") pursuant to which ACS may purchase LDI's accounts in accordance with the terms of such agreement and the other agreements, documents and instruments referred to therein or at any time executed and/or delivered in connection therewith.  Pursuant to the terms of the Account Purchase Agreement, LDI has assigned and will continue to assign, their present and future accounts to ACS, including accounts owing by {CLIENT NAME} and further, pursuant to 9-406 of Revised Article 9 of the Uniform Commercial Code, ACS has filed a Financing Statement covering [CLIENT NAME] accounts ("**Assigned Receivables**"), under the Sales Contract and all rights, remedies and monies payable in respect to the Assigned Receivables.

In connection with such assignment, ACS requires {CLIENT NAME} to agree the following:

1. **PAYMENT OF INVOICES**

   {CLIENT NAME} shall remit all amounts invoiced under the Sales Contract without set-off, deduction or counterclaim to the following bank account:

   **For check payments and related remittance advices, make checks payable and mail to:**
   {CLIENT NAME} – c/o ACS

10

LDI Networks IPSA

P.O. Box 936601
Atlanta, GA 31193-6601

**For ACH or wire payments, please send to:**
ACH / Wiring Instructions
Bank Name:
Routing Number:
Bank Account Number:
SWIFT Code:

This letter may only be revoked in writing by {LDI Network Inc} and ACS.  Payment(s) other than to the bank account specified above or (as the case may be) in accordance with a notification as aforesaid shall not discharge your obligation to pay such invoiced amounts.  Each approved invoice will indicate assignment and is an agreement to the terms in this letter.

Notwithstanding anything to the contrary in the Sales Contract, the Assigned Receivables are due and payable to the ACS irrespective of whether your customers have paid {CLIENT NAME}.

This notice and the Acknowledgement of Notice of Assignment executed by {CLIENT NAME}, (together, the "**No-Offset Agreement**") expresses the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior inconsistent agreements and understandings.

_____   _____
Initial       Initial

2.      **IP ADDRESS**

2.1    Set out hereunder are the prefix range of IP sources from which the Traffic shall originate from and/or be delivered to (the "**Specified Address**" or "**Specified Addresses**"):

2.1.1    LDI:      _____

2.1.2      {CLIENT NAME}: _____

2.2    Unless otherwise agreed to by the ACS, no party shall be entitled to invoice for Traffic, unless it originates from, and is delivered to a Specified Address or Specified Addresses.

3.      **DELIVERY**

No invoice or credit note shall be valid unless received from or delivered to ACS via ACS' online portal at www.alternacs.com, via client login under LDI's account.

No rate amendment from LDI shall be valid unless a notification has been sent to  r.labelle@alternacs.com.

Please kindly acknowledge receipt of this notice and confirm your agreement to its terms by initialing each page, signing the attached acknowledgement of assignment and returning it to us.

This notice shall be governed and construed in accordance with the laws of Florida (without giving effect to principles of conflicts of law or choice of law).

Best Regards,

_____

11

LDI Networks IPSA

Louis Arriola
**LDI Networks Inc.**

_____          _____
Initial               Initial

### ACKNOWLEDGEMENT OF NOTICE OF ASSIGNMENT

To:      Alterna Capital Solutions, LLC
         222 West Comstock, Ste 112
         Winter Park, FL  32789
         Attn:  Raymond LaBelle

We hereby acknowledge receipt of a notice (the "Notice of Assignment") of which the above is a duplicate and confirm our agreement to all of the terms thereof and, without prejudice to the generality of the foregoing, confirm and agree that:-

1.   {CLIENT NAME} agrees, represents and warrants to ACS (as defined in the Notice of Assignment) that in no event shall {CLIENT NAME}, or any person or entity claiming by, through or under it, offset or withhold payment in respect of any Assigned Receivables (as defined in the Notice for Assignment) for any offset, claim, defense, counterclaim, abatement, suspension, recoupment or deduction which {CLIENT NAME} may have against LDI Networks Inc. ("**Assignor**") for any amounts which may now or hereafter be due to {CLIENT NAME} from the Assignor for any reason.  {CLIENT NAME} waives any right that it may have under any Federal, State or other law, including, without limitation, all rights under Section 553 of the U.S. Bankruptcy Code, to assert any such rights;

2.   {CLIENT NAME} will pay all amounts invoiced under the Sales Contract owing to Assignor without set-off, deduction or counterclaim in accordance with paragraph 1 (Payment of Invoices) of the notice and we will comply with any instructions in relation to the Assigned Receivable as directed by you and will accept invoices properly rendered under the Sales Contract by ACS. We acknowledge that ACS will purchase Assigned Receivables from the Assignor in reliance on {CLIENT NAME's} to pay all amounts invoiced in accordance with paragraph 1 (Payment of Invoices) of the notice and we accept that this provision is reasonable having regard to all the circumstances and that, if we have a counterclaim against the Assignor it is reasonable that our recourse should be against the Assignor and not against ACS;

3.   In the event any offset, claim, counterclaim or deduction against any Assigned Receivables should arise in the future in favor of {CLIENT NAME} against Assignor, {CLIENT NAME} will assert the same, and pursue such rights and remedies as it may have, only against Assignor and not against ACS and whether or not {CLIENT NAME} shall ultimately prevail in respect of any such offset, claim, counterclaim or deduction asserted against the Assignor, {CLIENT NAME} shall pay, promptly when due, in accordance with their terms, any and all

12

Assigned Receivables of {CLIENT NAME} payable to the Assignor which may now exist or hereafter arise from time to time.  It is expressly understood and agreed that the provisions hereof shall apply and be effective as to Assignor as a debtor-in-possession in any proceeding under the U.S. Bankruptcy Code filed by or against it or any trustee in bankruptcy of Assignor.

4.  {CLIENT NAME} agrees that it will not sell, assign, grant a security interest in or otherwise transfer any interest in any amounts due from Assignor to {CLIENT NAME} or other right of {CLIENT NAME} to payments from Assignor, unless the assignee or transferee thereof first agrees in writing with ACS to be bound by the terms of the No-Offset Agreement (as defined in the Notice of Assignment) as if such assignee or transferee were an original signatory hereto.

5.  Unless otherwise agreed to by the ACS, no party shall be entitled to invoice for Traffic, unless it originates from and is delivered to the Specified Address or Specified Addresses as set out in the notice;

6.  {CLIENT NAME} will not do anything which in any way prejudices your rights, titles, benefits and interests thereunder under the Assigned Receivable;

7.  {CLIENT NAME} acknowledges that you shall be entitled to assign your rights under this acknowledgement;

8.  {CLIENT NAME} confirms that there are no amounts owing by LDI Networks Inc. to us which will be set off against amounts to be paid by us under the Sales Contract; and

9.  Notwithstanding anything to the contrary in the Sales Contract, the Assigned Receivables are due and payable to the ACS irrespective of whether our customers have paid {CLIENT NAME}.

_____   _____
Initial          Initial

This acknowledgement shall be governed and construed in accordance with the laws of Florida (without giving effect to principles of conflicts of law or choice of law).

**[CLIENT NAME]**

_____          _____
                                                               Date

Name:
Title:
[affix company seal]


<u>In the presence of</u>:

**Witness Signature**: _____

Name: _____

Address: _____

Occupation: _____

13

_____
Initial

_____
Initial

14

EXHIBIT B



## Individual Guaranty

**THIS DOCUMENT CONTAINS A WAIVER OF TRIAL BY JURY**

This GUARANTY dated as of _Jan 11 2019_ _____ is made by the individual(s) which have signed below (individually or collectively, "Guarantor"), in favor of Alterna Capital Solutions, LLC ("Creditor").

FOR GOOD AND VALUABLE CONSIDERATION, and to induce Creditor to extend financial accommodations to Client (as defined below), Guarantor agrees as follows:

**1. Definitions and Construction. As used herein:**

1.1. "Acceptable Forums" - See Section 15. hereof.

1.2. "Agreement" - This Guaranty, as amended.

1.3. "Bankruptcy Code" - Title 11 of the United States Code.

1.4. "Chosen State" - Florida

1.5. "Credit Documents" - The Invoice Purchase Agreement dated of essentially even date herewith between, Client and Creditor, all documents executed in connection therewith, and all amendments or renewals to or of any of the foregoing, or any other document evidencing a Guaranteed Obligation.

1.6. "Creditor" - See Preamble.

1.7. "Client" – LDI NETWORK INC., and all its successors-in-interest by operation of law or otherwise.

1.8. "Guaranteed Obligations" - All present and future obligations of Client to Creditor, including but not limited to obligations arising out of the Credit Documents, including interest, fees, expenses and other amounts, but for the filing of a petition under the Bankruptcy Code with respect to Client, would have accrued on any such obligations, whether all or any such amounts are allowed or allowable in any such case, and attorneys' fees and expenses.

1.9. "Guarantor" - See Preamble.

1.10. "Party" - Creditor and/or Guarantor.

**2. Guaranty.**

2.1. Promise to Pay and Perform. Guarantor unconditionally and irrevocably guarantees to Creditor the prompt payment and performance of the Guaranteed Obligations, and agrees to pay same on demand, whether or not the Guaranteed Obligations are found to be invalid, illegal or unenforceable, this being a guaranty of payment and not a guaranty of collection. Guarantor is obligated to make payment to Creditor, and Creditor may enforce its rights, under the Agreement without first seeking to obtain payment from Client, any other guarantor, any collateral, or pursuant to the exercise of any other right or remedy. Upon default under the arrangements with Client, or certain actions by or against the Guarantor, all Guaranteed Obligations are immediately due and payable and Creditor is entitled to enforce the obligations of Guarantor. This Guaranty is continuing, unlimited, absolute and unconditional.



2.2. Cumulative Obligations. The obligations hereunder are in addition to any other obligations of Guarantor under any other guaranties of the indebtedness or other obligations of Client or any other person at any time given to Creditor. This Agreement shall not affect or invalidate any such other guaranties.

2.3. Continuing Obligation. - This Agreement shall remain in full force and effect notwithstanding the fact that, at any particular time, no Guaranteed Obligations may be outstanding.

2.4. Joint and Several Obligation; Independent Obligation. - Guarantor is directly, jointly, and severally with all other guarantors of the Guaranteed Obligations liable to Creditor. The obligations of Guarantor hereunder are direct and primary and are independent of the obligations of Client or any other such guarantor, and a separate action may be brought against Guarantor irrespective of whether an action is brought against Client or any other guarantor or whether Client or any such other guarantor is joined in such action. Guarantor's liability hereunder shall not be contingent upon the exercise or enforcement by Creditor of any remedies it may have against Client or any other guarantor or the enforcement of any lien or realization upon any security Creditor may at any time possess. Any release that may be given by Creditor to Client or any other guarantor shall not release Guarantor, who expressly consents hereto to such a release.

**3. Covenants.**

3.1. Guarantor has adequate means to obtain all relevant information, on a continuing basis, concerning Client's financial condition as well as all other circumstances that bear upon the risk of nonpayment of the Guaranteed Obligations. Guarantor bears the sole responsibility for being and keeping informed thereof, and relieves Creditor of any duty to disclose any present or future information relating thereto.

3.2. Guarantor shall, from time to time, at the expense of Guarantor, promptly execute and deliver all further documents and take all further action that may be necessary, or that Creditor may reasonably request, to enable Creditor to exercise and enforce its rights and remedies hereunder.

3.3. Guarantor shall not create, incur, assume or permit to exist, any non-purchase-money lien upon or with respect to any of its assets. Guarantor authorizes Creditor to record a record in any public records filing office advising third parties that the taking of any such lien by them may constitute the tortious interference with Creditor's rights hereunder.

**4. Payments.**

4.1. Nature and Application of Payments. Creditor may apply any payment with respect to the Guaranteed Obligations or any other amounts due hereunder in such order, as Creditor shall in its sole and absolute discretion determine, irrespective of any contrary instructions received from any other person.

4.2. Indefeasible Payment; Revival. If any portion of any payment to Creditor hereunder is set aside and repaid by Creditor for any reason after being made by Guarantor, the amount so set aside shall be revived as a Guaranteed Obligation and Guarantor shall be liable for the full amount Creditor is required to repay plus all costs and expenses (including attorneys' fees, costs, and expenses) incurred by Creditor in connection therewith. This Section 4.2. shall survive termination of the Agreement.

5. Representations and Warranties. Guarantor represents and warrants as follows (which representations and warranties shall be true, correct, and complete at all times):

5.1. This Agreement is not made by Guarantor in reliance on any representation or warranty, express or implied, by Creditor concerning the financial condition of Client, the nature, value, or extent of any



security for the Guaranteed Obligations, or any other matter, and no promises have been made to Guarantor by any person to induce Guarantor to enter into this Agreement, except as set forth in this Agreement. Guarantor is presently informed of the financial condition of Client and of all other circumstances that a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Guaranteed Obligations.

5.2. The consideration received by Guarantor in connection with this Agreement is adequate and satisfactory in all respects, and represents reasonably equivalent value, to support this Agreement and Guarantor's obligations hereunder.

6. Waivers. Guarantor waives:

6.1. ANY AND ALL SURETYSHIP DEFENSES, WHETHER ARISING IN EQUITY, BY CONTRACT, STATUTE OR BY OPERATION OF LAW.

6.2. Notice of (a) any adverse change in the financial condition of any Client, (b) any default in the performance of the Guaranteed Obligations; and (c) any other notice to which Guarantor might be entitled.

6.3. Any defense or claim arising out of (a) the release of any collateral securing the Guaranteed Obligations or (b) any fact that may increase Guarantors risk hereunder.

6.4. Any claim of usury.

6.5. Any other defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations have been fully paid) of Client including any defense arising from any statute of limitations.

6.6. Any defense based on the invalidity, irregularity, or unenforceability of all or any part of the Guaranteed Obligations or any other circumstance which might constitute a defense of a guarantor.

6.7. Any claim or defense based on (a) the validity, legality or enforceability in whole or in part of the Guaranteed Obligations, (b) any assignment, amendment, transfer, modification, renewal, waiver, compromise, addition or supplement relating to Guaranteed Obligations, (c) any setoff, counterclaim or any circumstances which might constitute a defense or discharge of Guarantor.

6.8. Any lack of power or authority of Client.

6.9. Any defense to payment hereunder resulting from Creditor's releasing the Client or any other obligor owing the Guaranteed Obligations from their obligation to pay the Guaranteed Obligations, as well as Creditor's failure to give Guarantor notice thereof.

6.10. All Guarantor's rights of reimbursement, indemnification, subrogation, and contribution and any other rights and defenses that are or may become available to Guarantor.

6.11. All rights and defenses arising out of an election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation.

**7. Acknowledgements and Agreements.**

7.1. Modifications to Credit Documents and Guaranteed Obligations. Without notice to Guarantor and without affecting or impairing the obligations of Guarantor hereunder, Guarantor consents to the following: Creditor may, compromise or settle, extend the period of duration or the time for the payment, or discharge the performance of, or may refuse to, or otherwise not enforce, or may, release any obligor of the Guaranteed Obligations or may grant other indulgences to Client in respect thereof, or may amend the Credit Documents, or may enforce, exchange, release, or waive any security for the



Guaranteed Obligations or any guaranty of the Guaranteed Obligations.



7.2. Subordination. All present and future indebtedness of Client to Guarantor is subordinated to the payment of the Guaranteed Obligations. In this regard, no payment of any kind whatsoever shall be made with respect to such indebtedness until the Guaranteed Obligations have been indefeasibly paid in full. Guarantor shall have no right to take any action with respect to its indebtedness of Client, whether by judicial or non-judicial foreclosure, recordation or enforcement of mechanics liens, notification to the Client's account debtors, the seeking of the appointment of a receiver for any portion of the Client's assets, setoff, or otherwise, unless and until all Guaranteed Obligations have been fully and indefeasibly paid. Any payment received by Guarantor in respect of such indebtedness shall be held by Guarantor as trustee for Creditor, and promptly paid over to Creditor on account of the Guaranteed Obligations but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Agreement. Upon request by Creditor, any notes or other instruments now or hereafter evidencing such indebtedness of Client to Guarantor, shall be marked with a legend that the same are subject to this Agreement or shall be delivered to Creditor for safekeeping. Guarantor hereby grants Creditor the right to file claims, receive distributions, vote any claim of Guarantor and otherwise act on behalf of Guarantor in any bankruptcy case of the Client.

7.3. All notices shall be effective upon: (a) the sending of an email to one of the email addresses below or (b) delivery to a recognized overnight delivery service of a properly addressed notice, delivery prepaid, with instructions to make delivery on the next business day. For purposes hereof, the addresses of the parties are as set forth below or as may otherwise be specified from time to time in a writing sent by one party to the other in accordance with the provisions hereof:

GUARANTOR: Louis Arriola

Home Address:

Email: la@ldinetworks.com

CREDITOR: Alterna Capital Solutions, LLC

222 West Comstock Avenue, Suite 112, Winter Park, FL 32789

Officer: Stan Carpenter Email: scarpenter@alternacs.com

8. Amendment and Waiver. Only a writing signed by all parties hereto may amend this Agreement. No failure or delay in exercising any right hereunder shall impair any such right that Creditor may have, nor shall any waiver by Creditor hereunder be deemed a waiver of any default or breach subsequently occurring. Creditor's rights and remedies herein are cumulative and not exclusive of each other or of any rights or remedies that Creditor would otherwise have.

**9. Attorney's Fees.**

9.1. In the event that either Party finds it necessary to retain counsel in connection with any contract claim regarding the interpretation, defense, or enforcement of this Agreement, the prevailing party shall recover its reasonable attorney's fees and expenses from the unsuccessful Party.

9.2. It shall be presumed (subject to rebuttal only by the introduction of competent evidence to the contrary) that the amount recoverable is the amount billed to the prevailing party by its counsel and that such amount will be reasonable if based on the billing rates charged to the prevailing party by its counsel in similar matters.

**10. Successors and Assigns.**

10.1. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their



respective heirs, executors, personal representatives, and successors and assigns.



10.2. Creditor may assign its rights and delegate its duties hereunder in connection with an assignment of the Guaranteed Obligations. Upon such assignment, Guarantor shall be deemed to have attorned to such assignee and shall owe the same obligations to such assignee and shall accept performance hereunder by such assignee as if such assignee were Creditor.

11. Entire Agreement. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, personal representatives, and successors and assigns.

12. Revocation. Guarantor waives any right to revoke this agreement.

13. Choice of Law. This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Chosen State.

14. Waiver of Trial by Jury. IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

15. Venue; Jurisdiction. Any suit, action or proceeding arising hereunder commenced by for the interpretation, performance or breach hereof, shall be instituted in the federal or state court sitting in or nearest to Wilmington, DE or Orange County, FL (the "Acceptable Forum"). Guarantor agrees that the Acceptable Forum is convenient to it, and submits to the jurisdiction of the Acceptable Forum and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Guarantor waives any right to oppose any motion or application made by Creditor to transfer such proceeding to an Acceptable Forum.

IN WITNESS WHEREOF, Guarantor has executed this Agreement as of the date first written above.

By: _____ Date: _____

Date: Jan 11 2019

Print Name: Louis R. Arriola _____